The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 8, 2021

**2021COA91**

**No. 16CA0049, *People v. Valera-Castillo* — Constitutional Law — Fourteenth Amendment — Equal Protection; Juries — Batson Challenges**

A division of the court of appeals concludes that an objection to a peremptory challenge that allegedly violates *Batson v. Kentucky*, 476 U.S. 79 (1986) — which prohibits discrimination in the jury selection process — must be made before the peremptorily struck jurors are released from jury service because this allows the court to provide a meaningful remedy if a *Batson* violation is sustained. In *People v. Mendoza*, 876 P.2d 98, 102 (Colo. App. 1994), a defendant was precluded from making a *Batson* objection "after the venire was dismissed, the jury panel had been sworn, and the trial had begun." The division agrees with *Mendoza*'s framework, but now clarifies that a *Batson* challenge is too late if

the peremptorily struck jurors, including the juror who is the subject of the *Batson* challenge, have been released, thus leaving the trial court unable to afford a meaningful remedy that protects the defendant's and the struck juror's equal protection rights. *Batson*'s multiple objectives, coupled with the realities of the trial process, justify this clarification. Because Valera-Castillo's *Batson* challenge was not timely, the division declines to review it on the merits.

The division also concludes that any misconduct by the prosecutor in eliciting inadmissible CRE 404(b) evidence does not warrant reversal and that the prosecutor did not fail to correct allegedly false testimony. Lastly, it rejects Valera-Castillo's claim that his third degree assault conviction should merge with one of his second degree assault convictions. Having rejected Valera-Castillo's claims, the division affirms.

COLORADO COURT OF APPEALS                                    **2021COA91**

Court of Appeals No. 16CA0049
Jefferson County District Court No. 15CR590
Honorable Margie L. Enquist, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Crisoforo Valera-Castillo,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE FOX
Harris and Grove, JJ., concur

Announced July 8, 2021

Philip J. Weiser, Attorney General, Rebecca A. Adams, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Crisoforo Valera-Castillo, appeals the judgment of conviction entered on jury verdicts finding him guilty of two counts of second degree assault causing injury with a deadly weapon, three counts of felony menacing with a real or simulated weapon, and one count of third degree assault. Valera-Castillo argues that (1) the trial court failed to conduct a proper three-step inquiry under *Batson v. Kentucky*, 476 U.S. 79 (1986), in response to his timely objection to the prosecution's removal of Juror M, who apparently was not white;[1] (2) the prosecutor committed misconduct by eliciting inadmissible CRE 404(b) evidence and failing to correct false testimony; and (3) his third degree assault conviction should merge with one of his second degree assault convictions. We reject his claims and affirm.

## I.    Background

¶ 2    According to J.G., she and her friend met Valera-Castillo, her ex-boyfriend, at a restaurant. J.G. and her friend later left the restaurant in her friend's car for about ten minutes to get away from Valera-Castillo. When they returned, J.G. got into her truck to

---

[1] The parties seem to agree that Juror M was not white, but the record does not reveal Juror M's race, ethnicity, or nationality.

leave, but Valera-Castillo soon appeared in the parking lot. Valera-Castillo insisted that J.G. leave the restaurant with him and pulled her out of the truck. He then forced her into his car and drove her to his apartment.

¶ 3 On arrival, Valera-Castillo forced J.G. into his apartment, where they argued about their relationship status. J.G. tried to leave, but Valera-Castillo pulled her by the hair into the bedroom. When J.G. tried to leave again, he threatened her with a knife and cut her hand. Later, Valera-Castillo repeatedly hit her in the face. J.G. told him to stop and tried to scream for help, but after continuing to strike her, he strangled her with his hands.

¶ 4 Valera-Castillo eventually relented and drove J.G. to her house. J.G. told her roommate, and then her sister, what had happened. After picking her up, J.G.'s sister called the police. A police officer arrived, took a statement from J.G., and called an ambulance to take her to the hospital. Police searched Valera-Castillo's apartment that day and later arrested him.

¶ 5 The People charged Valera-Castillo with second degree kidnapping, two counts of second degree assault, three counts of menacing with a deadly weapon, and third degree assault. A jury

convicted him of all the charges except second degree kidnapping, and the court sentenced him to five years in the Department of Corrections' custody.

## II.  *Batson* Challenge

¶ 6     Valera-Castillo first argues that the trial court failed to conduct a proper three-step *Batson* inquiry following his counsel's objection to the prosecutor's use of a peremptory challenge to remove a prospective juror who did not appear to be white.  The People argue that defense counsel's *Batson* objection was untimely because he did not raise it until after the trial court had dismissed all non-selected prospective jurors.  Because the trial had not started, Valera-Castillo posits that his counsel's challenge was timely.  A *Batson* challenge is too late once the peremptorily struck jurors are released because, if the *Batson* challenge is sustained, the court is unable to provide a remedy that preserves the equal protection rights of the defendant *and* the improperly dismissed juror.  Because here the jurors had been released, the challenge was untimely and we decline to review the adequacy of the trial court's *Batson* inquiry.

### A.    Timing of a *Batson* Challenge

¶ 7     The United States Supreme Court has held that states are free to adopt rules governing *Batson* challenges, including the timeliness of a challenge. *Batson*, 476 U.S. at 99 & n.24 (declining to "formulate particular procedures to be followed," but contemplating that the objection be timely made); *see also Ford v. Georgia*, 498 U.S. 411, 423 (1991) ("Undoubtedly, then, a state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected."). Divisions of this court have held that a *Batson* challenge must "be made before the venire is dismissed and the trial begins."[2] *People v. Mendoza*, 876 P.2d 98, 102 (Colo. App. 1994) ("[D]efendant was precluded from making a *Batson* objection after the venire was dismissed, the jury panel had been sworn in, and the trial had begun."); *see also People v. Richardson*, 2018 COA 120, ¶ 52, *aff'd*, 2020 CO 46.

---

[2] In the context of for-cause challenges, if a party fails to raise a matter pertaining to the qualifications and competency of a prospective juror before the jury is sworn in, the matter "shall be deemed waived." Crim. P. 24(b)(2).

¶ 8     As relevant here, Rule of Criminal Procedure 24(d) addresses

how peremptory challenges are exercised but is silent on the timing

of a challenge:

> (2) . . . In . . . cases where there is one
> defendant and the punishment may be by
> imprisonment in a correctional facility, the
> state and the defendant shall each be entitled
> to five peremptory challenges . . . .
>
> . . . .
>
> (4) Peremptory challenges shall be exercised by
> counsel, alternately, the first challenge to be
> exercised by the prosecution.  A prospective
> juror so challenged shall be excused and
> another juror from the panel shall replace the
> juror excused. . . .

Crim. P. 24(d).  Relatedly, section 16-10-104, C.R.S. 2020, identifies

the number of peremptory challenges — generally five per side — in

a criminal case, but similarly does not speak to when they must be

exercised.  Before explaining why trial courts must refrain from

releasing the peremptorily struck jurors until the peremptory

challenge process concludes and a jury is selected and sworn, it is

helpful to explain the criminal jury selection process in Colorado.

¶ 9     A venire — meaning the pool of potential jurors — is the

starting point in the jury selection process.  After preliminarily

questioning the venire to identify any statutory disqualifications, most Colorado trial judges presiding over a criminal case will move twenty-five (or twenty-six, if there are two alternate jurors) members of the venire into the jury box. *See, e.g.*, *People v. Beauvais*, 2017 CO 34, ¶ 4. This allows the lawyers to question this smaller group, exercising for-cause challenges as they arise. A new venire member replaces any prospective juror in the box who is removed for cause. *See id.* Typically, jurors who are successfully challenged for cause are immediately released from jury service and allowed to leave the courtroom. *See id.* at ¶ 5 ("[T]he court released the excused potential jurors from jury duty and allowed them to leave the courtroom."). When the parties pass the remaining jurors for cause, each side begins exercising peremptory challenges; the prosecution goes first and then each side alternates in exercising the challenges. *See id.*

¶ 10 Virtually every jurisdiction in the country follows some version of this process. *See* 6 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure* § 22.3(d), Westlaw (4th ed. database updated Dec. 2020) (collecting cases); *see also* 2 Peter J.

Henning & Sarah N. Welling, *Federal Practice & Procedure* § 384, Westlaw (4th ed. database updated Apr. 2021) (collecting cases).

¶ 11 *Mendoza* held that a *Batson* challenge must "be made before the venire is dismissed and the trial begins." 876 P.2d at 102. But *Mendoza* does not elaborate further. Courts considering when a *Batson* challenge is too late have diverged into two main camps. Some hold that a *Batson* challenge is timely if it is made before the jury is sworn. *See, e.g.*, *People v. Knight*, 701 N.W.2d 715, 729 (Mich. 2005) (recognizing that "[t]here are several reasons why courts require a party to raise a *Batson* challenge before the venire is dismissed," but holding that, in Michigan, "a *Batson* challenge is timely if it is made before the jury is sworn"); *State v. Parker*, 836 S.W.2d 930, 935 (Mo. 1992) (stating that a *Batson* challenge raised before "the jury [is] sworn is timely"). Others have concluded that "a *Batson* challenge must be raised not only before the jury is sworn, but also before the remainder of the venire is dismissed in order to be deemed timely." *State v. Valdez*, 2006 UT 39, ¶ 38, 140 P.3d 1219, 1231; *see also McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) ("In view of the problems of responding to, ruling on, and remedying belated *Batson* challenges, we hold that

7

the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection.").[3]

¶ 12     These views have merit, but adopting any rule in this area requires us to take four interests into account: (1) the constitutional right of the defendant to a fair and impartial jury, *see Batson*, 476 U.S. at 87; (2) the constitutional right of venirepersons to serve without suffering racial discrimination, *Powers v. Ohio*, 499 U.S. 400, 406 (1991); (3) "the overriding interest in eradicating discrimination from our civic institutions," which "suffers whenever an individual is excluded from making a significant contribution to governance on account of his race," *Johnson v. California*, 545 U.S. 162, 172 (2005); and (4) the potential to waste the time of

---

[3] A few courts allow later *Batson* challenges — even after a jury has been empaneled and sworn — reasoning that a mistrial is an available remedy.  *See, e.g., City of Seattle v. Erickson*, 398 P.3d 1124, 1128-29 (Wash. 2017); *United States v. Thompson*, 827 F.2d 1254, 1257 (9th Cir. 1987) (allowing a *Batson* challenge "just after" the jury was sworn in).  That may be true, but the mistrial remedy is not ideal and certainly does not protect the excluded juror's right to serve.  *See, e.g., United States v. Walker*, 490 F.3d 1282, 1294-95 (11th Cir. 2007) ("[C]ourts have refused to grant new peremptory strikes or to dismiss the venire following a *Batson* error, finding that doing so would reward offending conduct by the striking party.").

prospective jurors who are peremptorily challenged but not immediately released from jury service. Weighing those interests, we now clarify that a *Batson* challenge is too late if it leaves the trial court unable to protect the first three of these interests. By requiring a *Batson* challenge to be made while the trial court has the ability to correct the error by disallowing the offending strike, the juror's and the defendant's equal protection rights are both preserved. That remedy is not available (1) when the judge has released the prospective juror who was the subject of the *Batson* challenge *before* the issue is brought to the judge's attention; or (2) when the *Batson* challenge is made after the judge has seated a jury. In our view, *Batson*'s objective, coupled with the realities of the trial process, justify this clarification. While peremptorily struck jurors may be excused from the jury box, it is critical that they not be released from jury service or allowed to leave the courtroom until all the peremptory strikes are exercised because reseating is the only effective way to protect the equal protection rights of all parties involved. *See Batson,* 476 U.S. at 99 n.24 (noting that one remedy for a sustained *Batson* challenge is to "resume selection with the improperly challenged jurors reinstated

on the venire").[4]  At the same time, ensuring that an improperly removed juror may be reseated buttresses public confidence "in the fairness of our system of justice."  *Id.* at 87.

¶ 13 Significantly, *Batson* challenges seek to remedy the "harm to the litigants, the community, and the individual jurors who are wrongfully excluded" that occurs when discriminatory jury selection criteria are tolerated.[5]  *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127,

---

[4] To be sure, the *Batson* Court did not suggest that either common remedy for a successful challenge — re-empanelment of the improperly struck juror or restarting the process — is more appropriate than the other.  Nor did the Court suggest that these are the only two remedies that the trial court should or may impose.  But starting the process over again is not only inefficient, it does nothing for the improperly struck juror and gives the party who improperly exercised the strike the outcome that it sought — a jury without that particular juror on it.  Whenever possible, then, re-empanelment should be the goal.  This timing also protects the state's interest in prosecuting the case because, in a jury trial, jeopardy attaches when the jury is sworn.  *People v. Berreth*, 13 P.3d 1214, 1216 (Colo. 2000).

[5] While individual jurors who are wrongfully excluded may bring suit to vindicate their right to serve, "[a]s a practical matter . . . these challenges are rare."  *Powers v. Ohio*, 499 U.S. 400, 414 (1991).  This is because "[p]otential jurors are not parties . . . and have no opportunity to be heard at the time of their exclusion."  *Id.* And a wrongfully struck juror cannot "easily obtain declaratory or injunctive relief when discrimination occurs."  *Id.*  Thus, in most cases where an individual juror is wrongfully excluded, the discrimination against the juror goes unredressed if he remains excluded from jury service.

140 (1994). *Batson* accomplishes its goals by prohibiting, as relevant here, race-based strikes of prospective jurors.[6] It requires the objecting party to raise a *Batson* challenge before the challenged jurors are released, and while the trial court is able to protect the defendant's equal protection rights, the juror's right to serve, and the community's interests.

¶ 14    Given that peremptory challenges are the last step in the jury selection process, it is not too onerous to require trial courts to refrain from releasing from jury service persons who have been peremptorily struck until the jury has been selected. Often the peremptory process will take a matter of minutes, not hours, and briefly retaining the peremptorily challenged jurors gives the court an important tool if a *Batson* challenge is raised. This process fully comports with Rule 24(d)(4). That a peremptorily challenged juror

---

[6] This case involves alleged racial discrimination by the prosecution in a criminal case, but *Batson*'s equal protection analysis reaches more broadly, *see People v. Rodriguez*, 2015 CO 55, ¶ 2 n.1, including gender discrimination, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994); *accord Craig v. Carlson*, 161 P.3d 648, 653 (Colo. 2007). It applies to civil litigants, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991), and criminal defendants, *Georgia v. McCollum*, 505 U.S. 42, 59 (1992), alike. And, it does not require racial identity between the defendant and the subject of the peremptory strike. *Powers*, 499 U.S. at 406.

is excused from the box of presumptive jurors does not mean that the juror must be immediately released from jury service or from the courtroom. *See* Crim. P. 24(d)(4).

¶ 15    This process also comports with the general principle that an objection must be raised before it is too late to take corrective action. *Martinez v. People*, 2015 CO 16, ¶ 14 ("An adequate objection allows the trial court a meaningful chance to prevent or correct the error and creates a record for appellate review.").

¶ 16    Requiring a prompt objection protects the defendant's equal protection rights by allowing counsel for both parties to argue the issue while it is fresh in their minds. *See, e.g., McCrory*, 82 F.3d at 1248 ("Because challenges are often based on . . . subtle, intangible impressions, the reasons for exercising the challenges may be quite difficult to remember if an objection is not raised promptly."). Promptness also aids the trial judge, whose recall of the prospective jurors' statements and non-verbal cues during voir dire will often be critical to assessing the reasons offered for exercising the challenged peremptory strike. *See, e.g., Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 89 (2d Cir. 2001) ("In ruling that the *Batson* motion was untimely, [the judge] explained that he could no longer

remember who had been struck from the venire that morning . . . .”), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  In all, a timely challenge will make it more likely that following the "*Batson* framework [will] produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson*, 545 U.S. at 172.

¶ 17     The approach we now adopt may slightly inconvenience some prospective jurors who are peremptorily struck but are not released from jury service until jury selection is complete.  This allows them to be reseated if a *Batson* objection is sustained.  *See Knight*, 701 N.W.2d at 729 ("Requiring courts to retain stricken jurors until the end of jury selection . . . could potentially burden trial courts and citizens called in for jury service if the selection process lasts several days.").  Convenience, however, must give way to constitutional guarantees and the overriding interest in upholding the integrity of our justice system.  In any event, efficient voir dire procedures can minimize the waiting time for such jurors — who, assuming they are not reseated, will serve the same amount of time as those venirepersons who are never called to the jury box.

¶ 18    Accordingly, we conclude that a *Batson* challenge must be raised while the peremptorily challenged prospective jurors remain available to be reseated, thus allowing the court to afford a meaningful remedy for a *Batson* violation. We turn next to the timing of Valera-Castillo's objection.

## B.    Application

¶ 19    During voir dire, the prosecutor used a peremptory challenge to dismiss Juror M, the only apparent person of color on the venire. After the parties exhausted their peremptory challenges, the trial court read aloud the names of those selected to serve on the jury and released the rest of the venire. A dismissed juror asked if those who had been dismissed were free to go home or if they were expected to return to the jury room, and the trial court responded that the dismissed jurors could go home.

¶ 20    After the court dismissed the non-selected jurors, Valera-Castillo's counsel approached the bench and the following colloquy took place:

> COUNSEL: Your Honor, may I approach? You didn't ask me if we had any challenges. We did have one.
>
> COURT: Well --

14

COUNSEL: No, that's fine.  Go ahead.

COURT: I think you have already waived it.
You should have approached if you had
anything you wanted to talk to me about.

The court then swore in the remaining jurors and released them for

lunch.

¶ 21     During the lunch break, defense counsel detailed his

objection, saying that "we were requesting a *Batson* challenge to

[Juror M].  He was the only minority that was on this panel.  Every

single other person did appear to be of a nonminority race."

Defense counsel pointed out that, while Juror M had said he was

concerned about minority representation in courtrooms and jails

across America, he could nonetheless be fair and impartial, and

thus the prosecutor's strike of Juror M ran afoul of *Batson.*

¶ 22     The trial court responded that defense counsel should have

"raised [the *Baston* issue] as soon as [the prosecutor] challenged

[Juror M] because that would have been the appropriate time to

make inquiry of the People once all of the challenges were

completed."  The trial court then allowed the prosecutor to make a

record regarding why she struck Juror M, and the prosecutor said

that she had done so because he "appeared disinterested

throughout the jury selection process." Specifically, she said Juror M looked tired and, because he was an intensive care unit nurse and may work late hours, she was concerned about his ability to complete the trial. The trial court concluded the discussion by stating "the record is what it is" and dismissed the parties for lunch.

¶ 23  Consistent with our clarification to *Mendoza*, we conclude that Valera-Castillo's *Batson* claim was untimely because his counsel raised it *after* the trial court dismissed the venire, including the challenged juror, and was unable to provide a meaningful remedy if it had sustained the objection. *See Mendoza*, 876 P.2d at 102. That trial had not yet started does not convince us otherwise. The trial court could not meaningfully give effect to *Batson* because the challenged juror had already been dismissed and the trial court was consequently unable to cure a *Batson* violation by disallowing the prosecutor's peremptory challenge, *Richardson*, ¶¶ 48-52, and reseating the juror who was struck.[7]

---

[7] We do not hold that defense counsel is always required to raise the *Batson* issue as soon as a juror is challenged. When a trial court waits to dismiss the jurors subject to peremptory strikes

¶ 24    Valera-Castillo claims his counsel's objection was contemporaneous with the court's dismissal of the non-selected jurors and before the trial court swore in the jury. But Valera-Castillo admits that "the read-out of the record demonstrates that defense counsel's objection *immediately followed* the dismissal instruction." (Emphasis added.) Further, his assertion that the non-selected jurors were still present in the courtroom when his counsel first raised the general objection cannot be confirmed by the record. It is also troubling that Valera-Castillo did not articulate the precise nature of his challenge (that he was invoking *Batson*) until after the trial court had dismissed the non-selected jurors and sworn the jury. *See Valdez*, ¶ 44, 140 P.3d at 1233-34 ("[T]o allow a *Batson* challenge to proceed after the venire has been dismissed is only to sanction abuse. If such a result were allowed, a party would be able to delay raising a *Batson* challenge until it

together at the close of voir dire, and defense counsel objects to a strike before their dismissal, then an improper strike can still be remedied by reseating the juror in question. This process also protects a defendant where a pattern of strikes allegedly in violation of *Batson* emerges. As the untimely objection precludes review, we need not address waiver or forfeiture. *See e.g.*, *People v. Rediger*, 2018 CO 32, ¶¶ 39-47 (discussing the difference between waiver and forfeiture).

determined whether it approved of the selected jury. Such sandbagging is antithetical to notions of judicial economy and procedural fairness."). Although jury selection may vary in different courtrooms, trial courts should inquire whether any objections remain *before* dismissing the jurors subject to peremptory strikes, thereby protecting the defendant's rights *and* the challenged juror's right to serve.

¶ 25 Because Valera-Castillo's *Batson* objection was untimely, we do not reach the merits of that contention. *See Richardson*, ¶ 52 (concluding the trial court properly declined to reach the merits of an untimely *Batson* objection).

### III.    Prosecutorial Misconduct

¶ 26 Valera-Castillo next argues that the prosecutor committed misconduct by eliciting inadmissible CRE 404(b) evidence and by failing to correct J.G.'s false testimony regarding information she shared with a police investigator. We disagree.

### A.    Additional Background

¶ 27 Before trial, Valera-Castillo filed a motion in limine to exclude evidence that he called J.G. on February 23, 2015, and asked her to drop the charges, warning that "she would have a huge problem if

18

she didn't." Valera-Castillo argued that the evidence was "a form of res gestae and 404(b) [evidence] that the prosecution has not requested be introduced as required by statute." During a hearing on the motion, the prosecutor argued that the statements were relevant and close in time to the alleged assault and that J.G. disclosed the statements to the police and an investigator. Valera-Castillo's counsel responded that the prosecution had not corroborated J.G.'s claim with phone records and that, while he was willing to subpoena the records, he would need a continuance to do so.

¶ 28    The trial court agreed that a subpoena was likely necessary to obtain the phone records and also agreed that the evidence fell under CRE 404(b). To avoid a continuance, the prosecutor agreed not to offer the statements unless Valera-Castillo "opened the door to that." The prosecution later affirmed this position in a notice of recently discovered evidence, which disclosed a police report stating that J.G. said Valera-Castillo had sent her a text offering her "money and a clear car title in exchange for dropping the charges against him."

¶ 29    On the morning of trial, Valera-Castillo sought admission of his phone records, arguing that they contradicted J.G.'s claim that he called her after the incident. The trial court indicated that Valera-Castillo's counsel could cross-examine J.G. about her contacts with him, showing her (and other witnesses) the phone records. The prosecutor challenged the accuracy of the records, and the court declined to admit them but allowed Valera-Castillo's counsel to serve the custodian of the records and instructed the attorneys to approach the bench before inquiring about the records. Defense counsel asked the trial court if he could cross-examine J.G. about the records, and the court responded, "Maybe, maybe not . . . . If you cannot establish the time that these calls and text messages were made, [then] no. But you can certainly ask her without the phone records whether she called him, whether she communicated with him."

¶ 30    Later that day, the following exchange occurred between the prosecutor and J.G.:

> [Prosecutor]: And after you received [information that Valera-Castillo was looking for you], did you call the Defendant?
>
> [J.G.]: Yes . . . .

[Prosecutor]: How many times did you call him?

[J.G.]: I don't remember, but after I saw the message I responded with a phone call.

[Prosecutor]: Did you talk to the Defendant?

[J.G.]: Yes, I was afraid of what he could do. I wanted to tell him that I didn't want to call the police, he practically forced me to call the police. . . . [H]e wanted to reach an agreement where we would exchange money. But I didn't accept.

Valera-Castillo's attorney objected on hearsay grounds, but the trial court allowed the testimony. The exchange continued:

[Prosecutor]: I'm sorry, can you restate that?

[J.G.]: Yes. He asked me if I could withdraw the accusation and reach an agreement; that if I did, he could give me . . . money, a car, an . . . apartment so I could bring my children. But I told him that I didn't want any of that. I was sorry, but I couldn't do that.

[Prosecutor]: [J.G.], have you shared that information with me . . . or the investigator before today?

[J.G.]: No. I hadn't shared the information. I had only shared information . . . about the constant messages that he sent telling me that he had sent money to my mother and the code to get that money. That was the information I had shared.

21

Defense counsel later cross-examined J.G. about her statements to police suggesting that Valera-Castillo had initiated a post-incident call.

¶ 31 Valera-Castillo's counsel later moved for a mistrial, challenging the trial court's admission of J.G.'s testimony about Valera-Castillo's efforts to persuade J.G. to drop the charges. The prosecutor responded that the trial court's previous ruling on this issue was based on "a lack of foundation as to whether the phone call actually took place" — which was no longer at issue — and that Valera-Castillo's counsel had opened the door to the testimony. Valera-Castillo's attorney asserted that he could not have opened the door to the testimony because he had not yet questioned J.G.

¶ 32 The trial court denied the motion, ruling that, while the prosecutor should not have elicited the testimony on direct examination when she had previously agreed not to, the People would have been able to ask about the content of the phone call on redirect examination because of "the way this case has been defended . . . the door would have been opened."

B. Preservation and Standard of Review

¶ 33    We conduct a two-step analysis when reviewing a claim of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we determine whether the conduct warrants reversal under the appropriate standard of review. *Id.*

¶ 34    Whether a prosecutor committed misconduct is an issue within the trial court's discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010). We will not disturb the court's ruling absent an abuse of discretion "resulting in prejudice and a denial of justice." *Id.* Under this standard, we ask not "whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *People v. Rhea*, 2014 COA 60, ¶ 58 (citation omitted). We also review evidentiary rulings for an abuse of discretion. *Davis v. People*, 2013 CO 57, ¶ 13. A court abuses its discretion when its decision is manifestly unreasonable, arbitrary, or unfair. *Id.*

¶ 35    The parties agree that Valera-Castillo did not preserve his argument that the prosecutor failed to correct J.G.'s allegedly false testimony. However, the parties dispute whether Valera-Castillo

preserved his argument that the prosecutor committed misconduct by improperly eliciting evidence barred by CRE 404(b). Specifically, the People assert that Valera-Castillo's counsel initially objected to J.G.'s testimony on hearsay grounds and, in supplementing the record later that day, did not sufficiently alert the trial court to the issues now raised on appeal.

¶ 36     "Parties must make objections that are specific enough to draw the trial court's attention to the asserted error," but we do not require talismanic language for preservation. *Martinez*, ¶ 14. While defense counsel's initial objection asserted hearsay, his later argument referencing the pretrial hearing on his motion in limine was sufficient to preserve the claim that the prosecutor committed misconduct by eliciting J.G.'s testimony about the substance of the February 23 phone call. Accordingly, we will review that claim under the nonconstitutional harmless error standard: an error is harmless when it did not substantially influence the verdict or impair the fairness of the trial. *Fletcher v. People*, 179 P.3d 969, 976 (Colo. 2007). We will review the unpreserved claim of prosecutorial misconduct for plain error and will reverse only if the error was obvious, substantial and so undermines the fundamental

fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *People v. Rediger*, 2018 CO 32, ¶48. Only prosecutorial misconduct that is flagrantly, glaringly, or tremendously improper warrants reversal. *Wend*, 235 P.3d at 1097.

### C. J.G.'s Testimony About the February 23 Phone Call

¶ 37 Evidence of a defendant's prior crimes or bad acts is generally inadmissible to prove the defendant's character to show that he acted in conformity therewith on a particular occasion. CRE 404(b). However, the evidence may be admissible for other purposes, such as proof of motive, intent, plan, identity, or absence of mistake. *Id.*; *see also People v. Compos*, 2019 COA 177, ¶ 29, *aff'd in part and vacated in part*, 2021 CO 19.

¶ 38 Valera-Castillo asserts that the prosecutor knowingly elicited testimony that he contacted J.G. and offered her money and other assets to persuade her to drop the charges. He argues that this was misconduct because the trial court ruled that any evidence that he contacted her about dropping the charges was inadmissible under CRE 404(b) and the prosecutor agreed not to present any such evidence.

¶ 39     The trial court's ruling on Valera-Castillo's motion in limine is not entirely clear.  Nonetheless, even assuming — without deciding — the trial court erred[8] by not holding the prosecution to its promise to avoid asking J.G. about the February 23 call and whether Valera-Castillo asked her to drop the charges in exchange for money and other assets, we conclude that any error was harmless.

¶ 40     On the record before us, it is highly unlikely that J.G.'s testimony about the February 23 phone call substantially influenced the verdict or impaired the fairness of the trial.  J.G. testified at length about the assault, the prosecutor presented photographs of her injuries, and the text messages Valera-Castillo sent J.G. after the assault covered the same subject matter.  The

---

[8] Even if the prosecution broke its own promise by asking J.G. about the substance of February 23 call, attempts to intimidate a witness or convince a witness to drop charges are evidence of consciousness of guilt not subject to CRE 404(b).  *See, e.g., People v. Gee*, 2015 COA 151, ¶ 26 (evidence of flight shows consciousness of guilt from which guilt itself may be inferred); *People v. Kyle*, 111 P.3d 491, 499 (Colo. App. 2004) ("Evidence of a defendant's behavior, including threats against witnesses or nonwitnesses, may be admissible to show that the defendant was conscious of guilt and, by further inference, committed the crime charged."), *overruled on other grounds by Zoll v. People*, 2018 CO 70.

prosecutor presented a text message Valera-Castillo sent on February 23, 2015, that said, "[J.G.], I hope you're okay. I don't know what to say. Hopefully we can talk. I'm sorry about what happened," and another on March 3 offering over $3,000 to J.G.'s mother. That the jury acquitted Valera-Castillo of second degree kidnapping indicates that the jury carefully weighed the evidence presented at trial in reaching its verdict. *See People v. Larsen*, 2017 CO 29, ¶ 16 (reiterating that a split verdict is an indication that prejudice did not affect the jury's verdict); *People v. Manyik*, 2016 COA 42, ¶ 40 ("[T]he fact that the jury acquitted [the defendant] of the most serious charge . . . indicates that the jurors based their verdict on the evidence presented and were not swayed by the prosecutor's [misconduct].").

¶ 41 Accordingly, we conclude that any misconduct by the prosecutor in eliciting J.G.'s testimony about the February 23 phone call does not require reversal. *See Fletcher*, 179 P.3d at 976.

D. Failure to Correct Allegedly False Testimony

¶ 42 "It is fundamental that prosecutors may not present or allow perjured testimony." *People v. Medina*, 260 P.3d 42, 48 (Colo. App. 2010). To establish a prosecutor's subornation of perjury, the

defendant must show that (1) the prosecutor's case included perjured testimony; (2) the prosecutor knew or should have known of the perjury; and (3) the perjury was material. *Id.* Perjury is material if there is any reasonable likelihood that the false statements could have affected the jury's judgment. *Id.*

¶ 43 Valera-Castillo argues that, after testifying about the February 23 phone call, J.G. falsely testified that she had not shared some of that information with investigators. Valera-Castillo bases this claim on the fact that, in the report of her previous statements to police, J.G. claimed he initiated the call asking her to drop the charges in exchange for money and a car title. He also relies on the prosecutor's pretrial statements indicating that J.G. informed the People about the phone call and his threatening statements.

¶ 44 However, a mere inconsistency in a witness's story is insufficient to support the conclusion that the testimony was perjured or that the prosecutor knowingly offered false testimony, *see People v. Schultheis*, 638 P.2d 8, 11 (Colo. 1981); *Gallegos v. People*, 116 Colo. 129, 132, 179 P.2d 272, 273 (1947) (holding that an assistant district attorney did not commit misconduct by eliciting testimony at trial that was contrary to a written statement

the witness provided to police because "[t]he mere fact that sworn testimony may differ from extrajudicial statements does not constitute perjury"), and Valera-Castillo has not conclusively demonstrated that J.G.'s trial testimony was false or that the prosecutor knew it to be false.

¶ 45    Before trial, J.G. told Investigator Brian Makloski of the First Judicial District Attorney's Office that "[Valera-Castillo] then called her and asked her to drop the charges saying she would have a huge problem if she didn't." Separately, J.G. told Agent Louis Tomasetti of the Lakewood Police Department that Valera-Castillo had "twice called her and once texted . . . on February 23, 2015 [and] . . . said the text offered her money and a clear car title in exchange for dropping the charges against him." At trial, J.G. testified that Valera-Castillo wanted to reach an agreement and offered her money, a car, and an apartment to drop the charges, *not* that he threatened her. The prosecutor asked if she had "shared that information with *me . . . or the investigator* before today?" (emphasis added), and J.G. responded that she had not.

¶ 46    While the exchange between J.G. and the prosecutor may have been imprecise,[9] the record supports the assertion that, before trial, she had only directly informed the Lakewood police — not the People or their investigator — about Valera-Castillo's offers.  But to the extent her trial testimony was inconsistent with her prior statements, this fact alone is not enough to demonstrate that her trial testimony was false or that the prosecutor knew it was false and did not require the court to act sua sponte.  *See Wend*, 235 P.3d at 1097.

¶ 47    Accordingly, we conclude that the prosecutor did not commit misconduct by allowing J.G. to testify regarding what she had told the prosecution and investigator about the February 23, 2015, phone call with Valera-Castillo.  *See Schultheis*, 638 P.2d at 11; *Gallegos*, 116 Colo. at 132, 179 P.2d at 273.

## IV.    Merger

¶ 48    Lastly, Valera-Castillo argues that one of his convictions for second degree assault (Count 4) and his third degree assault conviction must merge.  We disagree.

---

[9] J.G. gave her pretrial statements and trial testimony through an interpreter.

A.     Preservation, Standard of Review, and Applicable Law

¶ 49     We review de novo whether convictions merge. *People v. Denhartog*, 2019 COA 23, ¶ 73. We also review de novo a claim that a conviction violates a defendant's constitutional protection against double jeopardy. *People v. Arzabala*, 2012 COA 99, ¶ 19.

¶ 50     The parties agree that Valera-Castillo did not preserve his merger claim. We review unpreserved double jeopardy claims for plain error. *Reyna-Abarca v. People*, 2017 CO 15, ¶ 47.

¶ 51     The Double Jeopardy Clause protects an accused from being twice placed in jeopardy for the same crime. Double jeopardy rights are violated when, as relevant here, a defendant is convicted of a greater offense and a lesser included offense. *See id.* at ¶¶ 42, 81. One "offense is a lesser included offense of another offense if the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense." *Id.* at ¶ 3; *see also* § 18-1-408(5)(a), C.R.S. 2020.

¶ 52     Third degree assault merges with second degree assault where only a single act constituting one crime occurred. *See People v. Howard*, 89 P.3d 441, 447 (Colo. App. 2003) (vacating conviction

31

and sentence for third degree assault where defendant bit victim because it merged into second degree assault conviction for the same action). However, separate convictions do not violate double jeopardy if the evidence shows distinct and separate offenses. *Quintano v. People*, 105 P.3d 585, 591 (Colo. 2005); *see also Patton v. People*, 35 P.3d 124, 131 (Colo. 2001) (double jeopardy is not implicated when two offenses are based on separate conduct).

¶ 53    We look "to all the evidence introduced at trial to determine whether the evidence on which the jury relied for conviction was sufficient to support distinct and separate offenses." *People v. Mintz*, 165 P.3d 829, 834 (Colo. App. 2007) (quoting *Quintano*, 105 P.3d at 592). Factors relevant to whether the conduct constituted factually distinct offenses include "the time and location of the events, the defendant's intent, and whether the People presented the acts as legally separable," *People v. Wagner*, 2018 COA 68, ¶ 13, as well as whether the acts "were the product of new volitional departures, or were separated by intervening events," *Woellhaf v. People*, 105 P.3d 209, 219 (Colo. 2005).

B.    Analysis

32

¶ 54    Valera-Castillo argues that his third degree assault conviction should merge with one of his second degree assault convictions (Count 4) because they were based on the same act of strangulation.  However, at trial, the People presented evidence that Valera-Castillo committed two separate assaults when he repeatedly struck J.G.'s face (supporting the third degree assault), and later choked her (supporting the Count 4 second degree assault conviction).  J.G. testified that Valera-Castillo dragged her into his bedroom and struck her repeatedly.  She begged him to stop, but he then threw her onto the bed and threatened her with a belt.  Later, Valera-Castillo jumped on her, appeared to "realize[] what he had done," but continued attacking her.  This pattern repeated for some time before he strangled her.

¶ 55    Although these acts occurred in the same location and somewhat close in time,[10] they constituted separate acts based on a new volitional departure by Valera-Castillo.  J.G. told him to stop attacking her, and according to her testimony, he appeared as if he

---

[10] J.G. testified that the incident went on for a very long period of time, but it is unclear from her testimony how much time elapsed between his first strike to her face and the strangling.

might stop before he decided to strangle her. *See Quintano*, 105 P.3d at 591-92 (holding that separate offenses occurred where the defendant "persisted after the victim admonished him to stop several times").

¶ 56  Accordingly, because the evidence supports two separate crimes, we conclude that Valera-Castillo's second and third degree assault convictions do not merge. *See People v. Muckle*, 107 P.3d 380, 382-83 (Colo. 2005) (upholding the defendant's first degree assault and attempted first degree murder convictions where first bullet hit victim in the abdomen and second bullet hit victim in the back of his arm while he was moving away from the defendant); *see also Qureshi v. Dist. Ct.*, 727 P.2d 45, 47 (Colo. 1986) (upholding imposition of consecutive sentences for first degree assault and manslaughter convictions where defendant first stabbed victim in abdomen and, after victim had fled, subsequently pursued her and raised the knife against her throat or heart).

## V.  Conclusion

¶ 57  The judgment is affirmed.

JUDGE HARRIS and JUDGE GROVE concur.