22CA1048 Peo v Le Ber 08-15-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1048 Mesa County District Court No. 20CR1712 Honorable Gretchen B. Larson, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Tyler Todd Le Ber, Defendant-Appellant. JUDGMENT AFFIRMED IN PART AND VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS Division I Opinion by JUDGE J. JONES Welling and Schock, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 15, 2024 Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Mark G. Walta, Alternate Defense Counsel, Littleton, Colorado, for Defendant-
Appellant 
1 ¶ 1 Defendant, Tyler Todd Le Ber, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree assault (strangulation); second degree assault (serious bodily injury); third degree assault; misdemeanor menacing; and child abuse. Because we conclude that it rests on insufficient evidence, we vacate the judgment as to count 2, Le Ber’s second degree assault (serious bodily injury) conviction. However, we remand to the district court for entry of judgment and resentencing on the lesser included offense of third degree assault. The judgment is otherwise affirmed. I. Background ¶ 2 Le Ber had recently moved in with his girlfriend, S.B., when the two got into an argument. A physical altercation ensued, which occurred in several parts of the house. S.B.’s young daughter saw some of the altercation. S.B. suffered numerous injuries, including a subdural hemorrhage and resultant subdural hematoma (a buildup of blood underneath the dura of the brain). ¶ 3 The People charged Le Ber with one count each of first degree assault (count 1), felony menacing (count 6), and misdemeanor 
2 child abuse (count 7); and four counts of second degree assault, as follows: • Count 2 alleged that Le Ber committed second degree assault by causing serious bodily injury to S.B. “by hitting her head and/or slamming [S.B.’s] head against wall(s), a counter, and/or a door, causing her brain to bleed.” • Count 3 alleged that Le Ber committed second degree assault “by slamming her face against a counter and breaking her nose.” • Count 4 alleged that Le Ber committed second degree assault “by kicking [S.B.] in the arm and breaking her arm.” • And count 5 alleged that Le Ber committed second degree assault by strangling S.B. The People also charged several crime of violence sentence enhancers. ¶ 4 A jury acquitted Le Ber of the first degree assault charge and count 4 but found him guilty of the remaining counts. However, on count 3, the jury answered “no” to a special interrogatory on whether the conduct of breaking S.B.’s nose caused her serious 
3 bodily injury. Consequently, the trial court converted count 3 to a conviction for third degree assault, a class 1 misdemeanor. Likewise, the court converted the felony menacing count to a class 3 misdemeanor because the jury answered “no” to a special interrogatory asking whether the menacing involved the use of a deadly weapon. ¶ 5 The court imposed concurrent prison terms for Le Ber’s two felony convictions, the longest of which was eight years on count 2. II. Sufficiency of the Evidence ¶ 6 Le Ber contends that his conviction on count 2 cannot stand because it rests on insufficient evidence. In particular, he asserts that the prosecution presented insufficient evidence to show that the injury alleged in count 2 — a subdural hematoma — constituted serious bodily injury as defined by section 18-1-
901(3)(p), C.R.S. 2023. We agree. A. Preservation and Standard of Review ¶ 7 Le Ber concedes that he did not preserve this claim. However, regardless of preservation, we review the record de novo to determine whether the evidence presented was sufficient in both quantity and quality to sustain a defendant’s conviction. McCoy v. 
4 People, 2019 CO 44, ¶¶ 27, 63. We consider “whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.” Id. at ¶ 63 (quoting Clark v. People, 232 P.3d 1287, 1291 (Colo. 2010)). We give the prosecution the benefit of every reasonable inference which may fairly be drawn from the evidence, and we don’t substitute our judgment for the fact finder’s. Clark, 232 P.3d at 1291-92. B. Analysis ¶ 8 As now relevant, a person commits second degree assault if “[w]ith intent to cause bodily injury to another person, he or she causes serious bodily injury to that person.” § 18-3-203(1)(g), C.R.S. 2023. Relevant to the allegations in this case, serious bodily injury is “bodily injury that, either at the time of the actual injury or at a later time, involves a substantial risk of death.” § 18-1-
901(3)(p). Whether an injury qualifies as a serious bodily injury is a 
5 question of fact for the jury. People v. Baker, 178 P.3d 1225, 1233 (Colo. App. 2007). ¶ 9 Le Ber argues that People v. Vigil, 2021 CO 46, is dispositive of his sufficiency challenge because in that case, as in this one, the victim suffered an injury that theoretically could have resulted in substantial risk of death but, in reality, did not. We agree that Vigil controls. ¶ 10 Vigil interpreted the “substantial risk of death” portion of the serious bodily injury definition. Vigil, ¶ 1. For the prosecution to sustain a finding of serious bodily injury, Vigil held, “the facts of the actual injury control the substantial risk of death determination under section 18-1-901(3)(p), not the risk generally associated with the type of conduct or injury in question.” Id. at ¶¶ 4, 33, 45. That is, the definition of serious bodily injury “does not speak of bodily injury which ‘could,’ ‘might,’ or ‘generally does’ involve substantial risk of death; nor does the definition speak of a ‘category,’ ‘kind,’ or ‘type’ of bodily injury which involves substantial risk of death. Id. at ¶ 31. 
6 ¶ 11 Applying Vigil, we likewise conclude that the evidence admitted at trial, when viewed as a whole and in the light most favorable to the prosecution, wasn’t substantial and sufficient to support a conclusion by a reasonable mind that S.B.’s injury created a “substantial risk of death.” ¶ 12 The emergency room physician assistant initially in charge of S.B.’s care testified as an emergency medicine expert. He said that, based on S.B.’s account of her injuries and reported headache, and his observations of obvious trauma to her head, he was concerned that she might have a “bleed in her brain.” Consequently, he ordered a diagnostic scan to investigate this possibility. ¶ 13 The scan, interpreted by a neuroradiologist who also testified as an expert at trial, revealed a subdural hematoma, or a collection of blood that is “not actively bleeding” but was previously. Both the emergency medicine expert and the neuroradiologist indicated that there are “worrisome” risks and “concern[s]” generally associated with subdural hematomas, particularly in “younger” people. In particular, they indicated that ongoing bleeding can cause increased intracranial pressure which in turn can cause the brain 
7 to herniate or shift, blocking blood supply to the brain with stroke or death as a result. However, S.B.’s diagnosis after her initial scan indicated a small subdural hematoma “without shift.” ¶ 14 Both the emergency medicine expert and the neuroradiologist testified that care standards required that follow-up diagnostic scans be conducted after S.B.’s initial diagnosis to ensure that her brain had truly stopped bleeding and that the subdural hematoma “wasn’t getting bigger.” ¶ 15 S.B. was admitted for follow-up imaging. No testimony was presented as to what that imaging revealed. Rather, the neuroradiologist testified that “one of [his] partners read the follow-
up CT” the “next day” to “confirm [the subdural hematoma] wasn’t getting bigger.” But, the neuroradiologist testified, a person whose subdural hematoma “has not gotten bigger” will typically be discharged after follow-up imaging. And S.B. testified that she was at the hospital for a total of less than forty-eight hours from the time she was initially taken to the emergency department by police. ¶ 16 The emergency medicine expert filled out a serious bodily injury form, on which he opined that “the injuries sustained by 
8 [S.B.] m[e]t the legal definition” of serious bodily injury and indicated that S.B.’s subdural hematoma “involved a substantial risk of death.” Notwithstanding this opinion, however, we cannot — consistent with Vigil — conclude that sufficient evidence supports a determination that this was so. Similar to the situation in Vigil, the testimony showed, at most, that a subdural hematoma could involve substantial risk of death if it involved ongoing bleeding resulting in a midline shift. But no evidence was presented that S.B. suffered ongoing bleeding and the evidence affirmatively established the absence of a midline shift. Thus, “[w]ith the focus . . . properly on the facts of the actual injury as opposed to the risk generally associated with the type of conduct or injury,” we can’t conclude that the evidence supports a conclusion by a reasonable mind that the subdural hematoma involved a substantial risk of death. See Vigil, ¶ 38. Thus, the evidence was insufficient to establish that Le Ber committed second degree assault as charged in count 2. 
9 C. Remedy ¶ 17 Generally speaking, a determination that insufficient evidence supports a conviction requires that we vacate the judgment as to that conviction and remand the case for entry of a judgment of acquittal. See Hagos v. People, 2012 CO 63, ¶ 11. However, the supreme court has held that a jury that returns a verdict of guilty on a greater offense has implicitly determined that the evidence was sufficient to sustain a conviction on a lesser included offense, Halaseh v. People, 2020 CO 35M, ¶¶ 6-9, and a remand for entry of judgment on a lesser included offense is appropriate even where, as in this case, the jury wasn’t specifically instructed on just the elements of the lesser included offense, Lucero v. People, 2012 CO 7, ¶ 29; see also People v. Herold, 2024 COA 53, ¶ 27. ¶ 18 Though the prosecution presented insufficient evidence to prove serious bodily injury for count 2, the evidence was sufficient to sustain a conviction for third degree assault, a class 1 misdemeanor, and the jury necessarily found every element of that offense. See § 18-3-204, C.R.S. 2023 (a person commits the crime of assault in the third degree if the person knowingly or recklessly 
10 causes bodily injury to another person); People v. Howard, 89 P.3d 441, 444 (Colo. App. 2003) (third degree assault, as defined above, is a lesser included offense of second degree assault, as defined in section 18-3-203(1)(g)). Accordingly, and consistent with the district court’s approach in this case, we remand for entry of judgment of conviction for third degree assault on count 2, along with resentencing on that count. III. Merger ¶ 19 As an alternative to seeking the wholesale vacatur of count 2, Le Ber seeks merger of that count with count 3. Because we have elected to remand for entry of judgment on the lesser included offense of third degree assault for count 2, we address whether count 2 and count 3 must merge. We conclude that merger isn’t required. A. Standard of Review, Standard of Reversal, and Applicable Law ¶ 20 The parties agree that we review double jeopardy and merger questions de novo. See People v. Valera-Castillo, 2021 COA 91, ¶ 49. But they also agree that Le Ber didn’t preserve his merger claim. Thus, it is subject to a plain error standard of reversal. See id. Plain error is error that is obvious and that so undermines the 
11 fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. Hagos, ¶ 14. ¶ 21 The Double Jeopardy Clauses of the United States and Colorado Constitutions protect an accused from being twice placed in jeopardy for the same crime. See U.S. Const. amend. V; Colo. Const. art. II, § 18; Valera-Castillo, ¶ 51. Double jeopardy may be implicated when a court enters a judgment of conviction for multiple counts based on the same criminal conduct. See People v. Rigsby, 2020 CO 74, ¶¶ 32-34. ¶ 22 Separate convictions don’t violate double jeopardy if the evidence is sufficient to support distinct and separate offenses. See Quintano v. People, 105 P.3d 585, 592 (Colo. 2005). The question, therefore, is whether a defendant’s conduct constitutes factually distinct and separate acts such that it can support multiple convictions. ¶ 23 In Quintano, the supreme court declined to adopt any specific list of factors to determine whether a defendant’s acts constitute factually distinct offenses. Id. But relevant factors include whether (1) the prosecution treated the defendant’s acts as legally separable; 
12 (2) the acts occurred close in time or location; (3) the defendant’s conduct constituted a new volitional departure in his conduct; (4) the defendant reached a “fork in the road” leading to a fresh impulse; and (5) the acts were separated by intervening events. Id. at 591-92. No one factor is dispositive, and the inquiry should focus on all the evidence to determine whether the evidence on which the jury relied for conviction was sufficient to support distinct and separate offenses. People v. Wagner, 2018 COA 68, ¶ 13. B. Analysis ¶ 24 The parties don’t dispute that the evidence establishing the third degree assault alleged in count 3 was Le Ber’s act of slamming S.B.’s face on the kitchen counter. But Le Ber asserts that count 3 must merge with count 2 because, in his view, the evidence demonstrates that both offenses resulted from the act of slamming S.B.’s face into the counter. However, the charging document, the prosecution’s argument, and the testimony at trial demonstrate that this wasn’t clearly the case. 
13 ¶ 25 At trial, S.B. described multiple assaultive acts which occurred throughout the house over a period of time. She said that Le Ber hit her in the head, punched her in the face, shoved her head into a sliding door, slammed her face into the kitchen counter, and drove her head into a wall in her daughter’s bedroom while strangling her. And the emergency medicine expert testified that S.B. told him she was “punched in the head, choked, thrown to the ground, kicked in the head,” “punched in the face” multiple times, and had a headache. ¶ 26 The neuroradiologist testified that, in a case like this one, where multiple scalp hematomas are present in various locations on the head, it is difficult to determine the precise injury that may have caused the subdural hematoma. He further testified that a subdural hematoma could be caused by “a substantial punch to the face,” “somebody hitting their head” on something, or being hit with something. And he testified that S.B.’s injury could have been a coup or contracoup injury, meaning it may have resulted from a force to the side of the head where the injury was located or to the opposite side of where the injury was located. 
14 ¶ 27 The evidence adduced at trial didn’t establish that Le Ber’s act of slamming S.B.’s face into the counter was the act underlying count 2. Instead, it supported a conclusion that various assaultive acts — alone or in combination — could have caused this injury. Consistent with this conclusion, the People charged and the prosecutor argued that the combination of assaultive acts caused the brain bleed underlying count 2. The charging document identified the cause of the brain bleed as Le Ber’s acts of “hitting S.B.’s head and/or slamming her head against wall(s), a counter, and/or a door.” And the prosecutor asserted the following in closing argument: Now on the brain bleed . . . you got what’s called a unanimity instruction. And I just want to be clear about this: you must hold . . . the People . . . to the burden of proving that either all of the acts alleged to cause the brain bleed happened without . . . self-defense or . . . you all agree which act caused the brain bleed and that it happened without self defense. I would argue that it’s the former. It’s got to be the former because remember the testimony about coup and contracoup injuries? You can’t say it had to be the sliding glass door because that was to the back of her head, or it had to be the punch to the back of her head. Because it can be the blow to the front of the head on the counter that caused the brain to 
15 slam back against the back of the skull. Remember that testimony? So because it could be coup or contracoup, you’ve got to hold me to that high burden which is that we have to have proved that [it is] all the injuries which caused the brain bleed, which really obviously are head on wall in bedroom, head on wall and counter, right? (Emphasis added.) ¶ 28 Under these circumstances, we conclude that the evidence is sufficient to support distinct and separate offenses. Thus, we perceive no double jeopardy violation and, therefore, no need for merger. IV. Disposition ¶ 29 As to count 2, the judgment is vacated and the case remanded for (1) entry of judgment on the specified lesser included offense and (2) resentencing on that count. The judgment is otherwise affirmed. JUDGE WELLING and JUDGE SCHOCK concur.