The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
April 28, 2022

## 2022COA47

**No.18CA0525, *People v. Sanders* — Judges — Code of Judicial
Conduct — Disqualification — Impartiality; Juries — *Batson*
Challenges**

A division of the court of appeals considers whether, in light of

the holding in *Richardson v. People*, 2020 CO 46, a litigant may

properly rely on C.J.C. 2.11(A) to move for disqualification of a

judge due to an appearance of partiality. The division concludes

that, where the issue is preserved, reliance on Rule 2.11(A) remains

proper. The division further concludes that even if a judge is

impartial, a disqualifying appearance of partiality may arise where,

as here, a judge presiding over a criminal case has experienced

criminal conduct similar to the conduct at issue in the case before

her. However, disqualification on these grounds is generally not

required if the prior criminal conduct was remote and distinguishable.

The division also concludes that a trial court does not commit plain error when it reseats a stricken juror after a successful *Batson* challenge. *Batson v. Kentucky*, 476 U.S. 79, 99 n.4 (1986). The division determines that, under the circumstances of this case, reseating the stricken juror was the only complete remedy for the wrongful challenge. *People v. Valera-Castillo*, 2021 COA 91, ¶ 12.

COLORADO COURT OF APPEALS        **2022COA47**

Court of Appeals No. 18CA0525
El Paso County District Court No. 17CR760
Honorable Barbara L. Hughes, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Khalil Jamandre Sanders,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE RICHMAN
Grove, J., concurs
Tow, J., specially concurs

Announced April 28, 2022

---

Philip J. Weiser, Attorney General, Paul Koehler, First Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Tracy C. Renner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Khalil Jamandre Sanders, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree extreme indifference assault, illegal discharge of a firearm, and menacing.[1]  We affirm the judgment of conviction.

## I.     Background

¶ 2     Sanders shot another motorist during a road rage incident.  At the time of the shooting, he was driving down a two-lane road that narrowed to one lane.  Jamie Vasquez, who was in the adjacent lane, aggressively and repeatedly cut Sanders off in an apparent attempt to keep him from passing her.  In response, Sanders partially rolled down his window, thrust his gun through the opening, and fired a shot at Vasquez's car.  The bullet hit Vasquez, causing serious injury.

¶ 3     The jury convicted Sanders of the tried charges and made findings that supported crime of violence sentence enhancers.  On appeal, he contends that the trial court made several errors and

---

[1] Sanders was also charged with possession of a weapon by a previous offender.  He pleaded guilty to this charge and does not appeal this conviction.

violated his constitutional rights to due process and a fair trial. We address each contention in turn.

## II. Disqualification of Trial Judge

### A. Relevant Facts

¶ 4 Shortly after Sanders was charged, a district judge was assigned to his case. Approximately ten months later, at the close of the People's voir dire, the judge disclosed the following to counsel outside the presence of the venire:

> A few years ago I was driving . . . and I was shot at. Four bullets, one hit the car. There was not another person in the car, but . . . there were people in the middle of the road about to go into my lane. It looked like they were fighting, and I beeped my horn to get out of the way and I hear pop, pop, pop, ping, and it hit the spoiler on my car. I had to duck. . . . I feel like you need to understand there was a case filed. There was a . . . police report, but there was never any filing of any charges. There was never any person that was identified as the shooter.

¶ 5 Defense counsel moved for the judge's disqualification pursuant to section 16-6-201(1)(d), C.R.S. 2021, and Sanders's constitutional rights to due process and a fair trial. Defense counsel stated, "I don't believe at this point that the Court can be unprejudiced with respect to the facts of this case based on her own

personal experiences. . . ."[2]  Defense counsel also moved for a mistrial and leave to file a motion for a change of judge.

¶ 6     In an oral ruling, the judge denied the motions, stating that she (1) was not interested or prejudiced in any way; (2) had made the record out of an abundance of caution; (3) had no familiarity with Sanders; (4) was not familiar with any witnesses in this case as a result of her prior case; and (5) had "presided over numerous cases involving weapons, including guns and including cars" since the incident.  The judge also noted that the incident did not involve two cars, occurred about three years earlier, and did not involve road rage.

¶ 7     On appeal, Sanders renews his trial arguments, asserting that a judge in a criminal case should be disqualified when she has experienced criminal conduct similar to the conduct at issue in the case before her.

---

[2] It is not clear whether defense counsel was arguing that the judge was biased or was alleging an appearance of bias.  Apparently perceiving the concern to be actual bias, the judge addressed only actual bias in her ruling.

## B. Standard of Review and Preservation

¶ 8 We review de novo whether a motion to disqualify a judge raises legally sufficient grounds for disqualification. *People v. Roehrs*, 2019 COA 31, ¶ 7.

¶ 9 As an initial matter, although a motion for disqualification generally must be supported by affidavits and made within fourteen days of a judge's assignment, we conclude that procedural deficiencies do not preclude our review here. *See* § 16-6-201(3) (requiring affidavits); Crim. P. 21 (requiring affidavits and good cause for late-filed motions). The motion was made after the fourteen-day deadline, but defense counsel raised the issue as soon as she learned the pertinent facts. It was therefore timely. *People v. Dist. Ct.*, 192 Colo. 503, 507, 560 P.2d 828, 831 (1977). The motion was also based solely on disclosures made in open court and arose due to the court's post-disclosure invitation to make an immediate record. Under these circumstances, the issue was preserved. *See People in Interest of C.Y.*, 2018 COA 50, ¶ 12 (finding the issue preserved under similar circumstances).

## C. Law and Analysis

¶ 10    Unless the law precludes her participation, a judge has a duty to sit on a case once it is assigned. *People v. Thoro Prods. Co.*, 45 P.3d 737, 747 (Colo. App. 2001). Sanders bases his arguments on constitutional, legislative, and judicial limits on this duty to preside, arguing that each layer of limitation requires disqualification.

¶ 11    The outermost layer, which places the narrowest constraints on judges, requires that a judge be disqualified only when her participation violates constitutional due process guarantees.[3] *Williams v. Pennsylvania*, 579 U.S. 1, 4 (2016); *No Laporte Gravel Corp. v. Bd. of Cnty. Comm'rs*, 2022 COA 6M, ¶ 2 (noting that the Due Process Clause marks "the outer limits for judicial disqualifications"). Due process is satisfied when a judge holds no actual bias. *Williams*, 579 U.S. at 8. Here, Sanders does not challenge the finding that the judge held no actual bias. Given this finding, the judge's participation was not a violation of due process.

---

[3] Sanders raised both federal and state constitutional due process concerns. However, he makes no argument that the Colorado Constitution provides greater due process protections than the United States Constitution. Therefore, we undertake no separate analysis of Colorado constitutional law.

¶ 12    Colorado statutes and rules provide another layer of protection.  Pursuant to section 16-6-201(1)(d), a judge "shall be disqualified to hear or try a case if . . . [sh]e is in any way interested or prejudiced with respect to the case, the parties, or counsel."  *See also* Crim. P. 21(b).  Like the Due Process Clause, this statute and rule, by their terms, only protect litigants from participation by a judge with actual bias.  *See Roehrs,* ¶ 10 (stating that C.J.C. 2.11(A) "goes further" than section 16-6-201(1)(d) and Crim. P. 21(b) because it permits challenges not grounded on actual bias); *People v. Jennings,* 2021 COA 112, ¶¶ 18-20 (distinguishing actual bias from the appearance of bias and citing section 16-6-201(1)(d) and Crim. P. 21(b) as prohibiting actual bias).  Thus, neither the statute nor Crim. P. 21(b) requires disqualification here.

¶ 13    Perhaps in recognition of this fact, Sanders essentially grounds his substantive appellate arguments on C.J.C. 2.11(A), which provides the broadest bases for recusal.  Rule 2.11(A) states that a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ."  This standard is objective and requires disqualification whenever a "reasonable observer might have doubts about the judge's

6

impartiality." *People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011). The rule prohibits a judge from participating when her involvement raises the appearance of bias, even if she has no actual bias. *Id.*

¶ 14   The People argue that Rule 2.11(A) cannot justify reversal because, in *Richardson v. People*, 2020 CO 46, ¶ 39, the supreme court emphasized that judicial ethics rules are intended to preserve public confidence, not to protect the individual rights of litigants. Thus, "in the absence of evidence demonstrating actual judicial bias or prejudice, a trial judge's potential violation of these rules does not mandate reversal." *Id.*

¶ 15   We do not read *Richardson* to preclude consideration of the Code of Judicial Conduct (C.J.C.) with respect to disqualification. While *Richardson* held that a violation of the C.J.C. does not always mandate reversal, the *Richardson* court was addressing whether a judge must, sua sponte, recuse herself when a party has waived disqualification despite an appearance of bias. *Id.* at ¶¶ 35-39; *see* C.J.C. 2.11(C). Thus, *Richardson* turned, in part, on waiver issues not relevant here.

¶ 16    Copious precedent, which was not explicitly overruled in

*Richardson,* suggests reversal may be warranted when a party

moves for disqualification due to an appearance of bias and the

judge, in fact, had a duty to disqualify herself.  *See, e.g., A.G.,* 262

P.3d at 650; *People v. Julien,* 47 P.3d 1194, 1197 (Colo. 2002) ("A

judge must also consider the Code of Judicial Conduct sua sponte

or in response to a disqualification motion in determining whether

to serve on the case.")*; Zoline v. Telluride Lodge Ass'n,* 732 P.2d 635,

640 (Colo. 1987) (considering the C.J.C. and concluding that "[e]ven

if the judge's pecuniary interests alone were not grounds for

disqualification, the facts give rise to the appearance of impropriety

that requires us to reverse"); *Wright v. Dist. Ct.,* 731 P.2d 661,

663-64 (Colo. 1987) (requiring disqualification due, in part, to an

appearance of impropriety).  Thus, Sanders may properly base his

arguments on Rule 2.11(A).

¶ 17    Nonetheless, we perceive no disqualifying appearance of bias

here.  Sanders has not cited, and we have not found, any Colorado

precedent holding that an appearance of bias arises whenever a

judge presiding over a criminal case has experienced criminal

conduct similar to the conduct at issue.  Such a bright line rule is

8

too great an encroachment on a judge's duty to impartially preside over her assigned cases. *See State v. Tappa*, 2002 WI App 303, ¶ 14 (noting the impracticality of requiring a judge to disclose any crime of which she was ever a victim, regardless of how much time has passed); *see also State v. Asta*, 2018 UT App 220, ¶ 21 (noting that the Utah Code of Judicial Conduct may require recusal based on an appearance of partiality, and stating, "it cannot be that, in all cases involving all crimes, a judge must disqualify herself if she has previously been the victim of any similar crime").

¶ 18     Although Colorado courts have not considered whether there is an improper appearance of partiality when a judge has experienced criminal conduct similar to the conduct at issue, our review of analogous cases from other states reveals that the necessity of disqualification depends largely on the remoteness of the prior incident and the degree of similarity between the prior incident and the charged conduct. *See State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994) (applying the Iowa Code of Judicial Conduct, which requires recusal when "the judge's impartiality might reasonably be questioned," and concluding that a judge could sit on a child sexual assault case despite being sexually abused as a child

9

because his experiences were remote and factually distinguishable) (citation omitted); *Bishop v. State*, 98 A.3d 317, 331 (Md. Ct. Spec. App. 2014) (determining that, although he had been the victim of a murder-for-hire plot, a judge was not required to recuse himself from a murder-for-hire case due to an appearance of impropriety because the facts of each case were materially different); *Asta*, ¶ 21 (concluding that a judge who had been a burglary victim could sit on a burglary case in the absence of a showing that the crimes shared compelling factual similarities).

¶ 19    Here, all the record reflects is that the judge was driving when shots were fired and at least one shot hit her car. Although similarities between the criminal conduct experienced by the judge and Sanders's charged conduct are material to whether there was a disqualifying appearance of bias, such similarities are not dispositive. We must also consider facts that distinguish the prior incident. We find it significant that the judge was not actually shot or injured in the prior incident, and there was no indication that she was the target of the shooter or that shots were fired due to road rage. In addition, the incident occurred three years earlier and did not result in charges or a trial. Given the remoteness of the

10

incident and the material differences between the conduct charged in this case and the conduct described by the judge, we conclude there is no appearance of partiality that would lead a reasonable observer to doubt the judge's impartiality. Therefore, disqualification was not required.

### III. *Batson* Violation

#### A. Relevant Facts

¶ 20 At the close of voir dire, as the parties exercised their peremptory challenges, Juror W was called to the jury box to replace an excused juror. The People immediately exercised a peremptory challenge to Juror W, and the defense raised a *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting racial discrimination in the jury selection process). At a bench conference, defense counsel asserted that the strike was racially motivated. As proof she noted that, like Sanders, Juror W is Black. She also noted that the venire included only three Black jurors out of sixty. The People set forth a purported neutral reason for the strike. Finding that the record did not support the People's assertions, the court sustained the *Batson* challenge, ended the

bench conference, and reseated Juror W without any further objection or explanation to the empaneled venire.

¶ 21    Juror W served on the jury on the first day of trial.  The jury was instructed to return two days later at 8:20 a.m.  On the next day of trial, by approximately 8:45 a.m., Juror W had not appeared. The court stated that it was having trouble contacting her, and the parties agreed to a recess.  After the break, the court explained to counsel that Juror W had given the court the wrong phone number. Even so, the court had determined that Juror W was on her way to the courthouse, but she was still on a bus awaiting transfer.  The following discussion ensued:

> Court: So I understand Counsel wants to keep proceeding without [Juror W].
>
> People: That's correct, Your Honor.  We have two alternates.
>
> Defense: That's fine, Your Honor.

The trial then proceeded without Juror W.

¶ 22    Sanders now asserts that the trial court committed structural error by (1) reseating Juror W after the *Batson* challenge was sustained rather than discharging the entire venire and restarting

12

the jury selection process; and (2) proceeding without Juror W on the second day of trial.

### B.    Law and Analysis

### 1.    Reseating of Juror W

¶ 23    We first consider Sanders's assertion that the trial court's decision to reseat Juror W was erroneous.[4]  Although he did not object when Juror W was reseated and therefore forfeited his argument, he raises the contention on appeal, and we will review for plain error.  *People v. Rediger*, 2018 CO 32, ¶ 40.

¶ 24    The Colorado Supreme Court has not squarely addressed the appropriate remedy for *Batson* violations or the relevant standard of reversal.  *People v. Wilson*, 2015 CO 54M, ¶ 9 n.3 (concluding that no *Batson* violation occurred and declining to "address whether such a violation constitutes structural error").  However, in *Batson* itself, the Supreme Court of the United States discussed the propriety of reseating a challenged juror:

---

[4] Sanders argues that reseating Juror W was a "structural error" that requires automatic reversal because it affected the framework of the trial.  *People v. Vigil*, 2013 COA 102, ¶ 31.  We disagree that this type of error is among the errors that have been recognized as structural.  *Id.*

13

> [W]e express no view on whether it is *more appropriate in a particular case . . .* for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire.

*Batson*, 476 U.S. at 99 n.24 (emphasis added) (citation omitted). Thus it acknowledged that in "a particular case" either dismissing the venire or reseating the juror may be "*more* appropriate." *Id.* (emphasis added). By implication, both remedies are "appropriate" under the Constitution and left to the discretion of the trial judge. *See id.* In light of this language, we conclude that reseating Juror W was not error, plain or otherwise.

¶ 25 Our conclusion that reseating Juror W was not erroneous is also supported by existing precedent. The trial court followed a procedure that was later approved in *People v. Valera-Castillo*, 2021 COA 91, ¶ 12. There, the division explained that a *Batson* challenge must be made "while the trial court has the ability to correct the error by disallowing the offending strike." *Id.* It can do so, the division reasoned, by declining to release the stricken juror from jury service and requiring her to remain in the courtroom until

14

all peremptory strikes have been exercised. According to the division, this procedure is proper because "reseating is the only effective way to protect the equal protection rights of all parties involved." *Id.*

¶ 26     We agree with the *Valera-Castillo* division's reasoning and conclude that reinstating the challenged juror appears to be the only complete remedy for a wrongful *Batson* challenge under the circumstances presented here. Otherwise, counsel making an improper challenge would have gotten what he desired — the dismissal of the challenged juror — although the objection to his conduct was sustained. *Id.* at ¶ 12 n.4 (noting that starting over gives the party that improperly exercised a strike the outcome it sought). Indeed, any other result could encourage unscrupulous counsel to provoke *Batson* challenges through knowingly improper peremptory strikes. Assuming such challenges are sustained, counsel will have obtained, by improper means, the dismissal of a qualified venire simply because they found it undesirable.

¶ 27     Reseating Juror W was appropriate in this case because we have no reason to suspect the other jurors knew why Juror W was stricken and reseated. The relevant discussion occurred at a bench

15

conference out of the jury's hearing. Thus, any possibility the jury knew the reason for the strike, and any potential prejudice arising from the challenge itself, was minimal. *See Jones v. State*, 683 A.2d 520, 529 (Md. 1995) (noting that the likelihood of prejudice is minimal if counsel explains the reasons for the strike during a bench conference). The reseating of Juror W was not erroneous.

### 2. Dismissal of Juror W

¶ 28 The People assert that Sanders waived his contention that Juror W's later dismissal was erroneous. We agree.

¶ 29 Waiver occurs when a party intentionally relinquishes a known right or privilege. *Rediger*, ¶ 39. Here, the trial court asked the parties whether they had made an agreement to dismiss Juror W, alerting Sanders of the opportunity to object. The People confirmed that an agreement had been reached, and Sanders did not object. His counsel instead replied, "that's fine." Sanders's explicit affirmation, through counsel, that he had no objection to Juror W's dismissal and his implicit agreement that he had stipulated to her dismissal was an "*unequivocal* act indicative of a waiver." *Id.* at ¶ 42 (quoting *Dep't of Health v. Donahue*, 690 P.2d

16

243, 247 (Colo. 1984)).  We therefore conclude that the issue is waived, and we decline to address it.[5]

## IV.   Jury Instructions Regarding the Absent Victim

### A.   Relevant Facts

¶ 30    At the time of trial, Sanders had previous felony convictions. As the trial began, the People informed the court of a concern that the victim, Vasquez, who knew of Sanders's background, would insist on testifying about his criminal history despite being instructed not to do so.  However, although she was subpoenaed, Vasquez did not show up on the first day of trial.  The People therefore requested, and the court issued, a warrant for her arrest.

---

[5] In his reply brief, Sanders argues that even if he waived the right to have Juror W sit on his petit jury, he has standing to raise Juror W's right to serve.  While we affirm that the Equal Protection Clause is violated when the State uses a peremptory challenge to exclude potential jurors on the basis of race, and that a defendant has standing to raise this issue on behalf of a juror, *see Powers v. Ohio*, 499 U.S. 400, 409 (1991), Juror W's right to sit on a jury is not at issue here.  Juror W was, in fact, allowed to sit on the jury despite the State's attempt to exclude her on the basis of race.  Thus, no *Batson* violation remained once Juror W was reseated.  Juror W's later dismissal was due to her tardiness, an issue not implicating constitutional protections recognized in *Powers* or *Batson*.

17

¶ 31    On the second day of trial, before Vasquez was found, defense counsel questioned the lead detective in this case.  She asked him whether he was "aware that [the prosecutor] requested . . . an arrest warrant for the victim's arrest."  The People objected and the court sustained the objection.

¶ 32    Later, Vasquez arrived, but she was not called as a witness. The People explained to the court and counsel that although she was present, when the prosecution met with her and instructed her not to testify regarding Sanders's criminal history, she became irate and refused to sign a statement promising to comply.  One of the prosecutors stated, "I'm afraid that if we put her on the stand that she would mistry this case.  I can't in good conscience put her on the stand."  The People asked the court to quash the warrant.

¶ 33    At the jury instruction conference, defense counsel noted that, to cure any prejudice caused by her question to the lead detective, the court had invited her to draft an additional instruction.  The tendered instruction read:

> In deliberating, you may use the fact that the alleged victim absented herself, as a factor to consider in determining whether the District Attorney has met their burden.  You may further consider, the fact that the District

> Attorney has the power to subpoena witnesses and the ability to request a warrant for a failure to appear on a subpoena in deciding whether the District Attorney has proven his case beyond a reasonable doubt.

The People objected to giving this instruction, and the court sustained the objection, noting that the reasonable doubt instruction already informed the jury that it could consider a lack of evidence in determining whether the People met their burden of proof.[6]  On appeal, Sanders contends that the trial court abused its discretion by declining to give his instruction because it properly stated the law.

## B.    Law and Analysis

¶ 34    We review the jury instructions de novo to determine whether they correctly informed the jury of the law.  As long as we are satisfied that the jury was adequately instructed on the law, we review the trial court's decision to give or decline to give a particular instruction for an abuse of discretion.  *People v. Roberts-Bicking*,

---

[6] The reasonable doubt instruction stated: "Reasonable doubt means doubt based on upon reason and common sense which arises from a fair and rational consideration of all the evidence, or the lack of evidence, in the case."

19

2021 COA 12, ¶ 17. A court abuses its discretion when its ruling is manifestly arbitrary, unfair, or unreasonable. *Id.*

¶ 35    Contrary to Sanders's contention, a trial court is not obligated to give any jury instruction submitted by the defendant simply because it correctly states the law. "An instruction with respect to a missing witness is appropriate only if the witness' absence is due solely to the actions of the People." *People v. Raibon*, 843 P.2d 46, 51 (Colo. App. 1992). Here, both parties had the power to call Vasquez to testify and both chose not to do so in light of Vasquez's unwillingness to comply with evidentiary constraints. Crim. P. 17. Thus, her absence was not the exclusive result of the People's conduct, and the court was not required to give the proposed instruction. *Raibon*, 843 P.2d at 51.

¶ 36    Further, although Vasquez's failure to testify was relevant to whether the People met their burden of proof, a trial court is not required to give a supplemental instruction that merely sets forth a principle already encompassed in the existing instructions. *People v. Welsh*, 176 P.3d 781, 787 (Colo. App. 2007). As the trial court correctly noted, the existing reasonable doubt instruction informed the jury it should consider a lack of evidence when rendering its

verdict. And, in closing argument, the defense was allowed to draw the jury's attention to Vasquez's absence.

¶ 37　For these reasons, we perceive no abuse of discretion by the trial court.

## V.　Prosecutorial Misconduct

¶ 38　Finally, Sanders asserts that his trial was tainted by prosecutorial misconduct emanating from four groups of statements by the prosecutors. He did not object to these statements at trial.

## A.　Law

¶ 39　When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 40　We first determine whether the challenged statements were improper, considering the totality of the circumstances. *Id.* Whether statements were improper depends on their nature and whether the statements directed the jury's attention toward considerations outside its purview. *People v. Perea*, 126 P.3d 241, 247 (Colo. App. 2005). Counsel may comment on the evidence, the reasonable inferences to be drawn therefrom, and the instructions. *Id.* A prosecutor may also draw the jury's attention to evidence that

21

raises questions about a witness's credibility and, based on the evidence, draw reasonable inferences regarding the credibility of witnesses. *Id.*

¶ 41    If we determine that a prosecutor's statements were improper, we consider whether the improper statements warrant reversal under the applicable standard of review. *Wend*, 235 P.3d at 1096. Where, as here, plain error review applies, we reverse "only when an error so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005).

## B.    Vasquez's Absence

¶ 42    During rebuttal argument, one of the prosecutors discussed Vazquez's absence from trial. He stated,

> The defense wants to know why [Vasquez] is not here. Would you like to see the person that did this to you? Do you want to face him? Would you want to talk to him about what happened to you that day, the feelings you felt, the insecurities that you have now? Is it any surprise that she's not here? No. It's not.

¶ 43    Sanders asserts that these statements were improper because the prosecutor (1) asked the jury to sympathize with Vasquez and put themselves in her place; (2) misrepresented Vasquez's motives

22

for failing to testify; and (3) suggested that, given her distress, it would be unfair to compel her to testify, thereby making an improper comment on his constitutional right to confront adverse witnesses. *See* U.S. Const. amend. VI. We are not persuaded.

¶ 44 Colorado courts have indeed deemed it improper, in the guilt phase of a criminal trial, for a prosecutor to direct the jury to follow the "golden rule" and imagine themselves in the victim's place. *People v. Rodriguez*, 794 P.2d 965, 973 (Colo. 1990). However, prosecutors are afforded considerable latitude when they are replying to arguments made by the defense. *People v. Lovato*, 2014 COA 113, ¶ 63. When determining whether arguments were improper, courts must "weigh the effect of those remarks on the trial, and also take into account defense counsel's 'opening salvo.'" *Id.* (quoting *Perea*, 126 P.3d at 247).

¶ 45 Here, defense counsel's opening salvo involved telling the jury, inaccurately, that it was up to the People to bring in the alleged victim so that the jury could judge her credibility. *People v. Walters*, 821 P.2d 887, 889 (Colo. App. 1991) (holding there is no constitutional requirement that crime victims testify); Crim. P. 17 (stating that both parties may subpoena witnesses). Defense

23

counsel also asked the jury to consider the import of Vasquez's absence, imploring it to evaluate, "[W]hat does she have to hide? . . . What does she have to say about her dangerous and aggressive driving behavior?" Given defense counsel's willingness to impute hypothetical motives to Vasquez (despite her knowledge of Vasquez's true motives) and to misstate the law, we cannot say it was improper for the prosecutor to reply with hypothetical questions that implied different motives. Further, because the arguments presented were hypothetical, we do not view them as misrepresenting Vasquez's actual motives to the jury. Because they were made in response to similar defense arguments, it is also clear that the prosecutor was not commenting on the right to confront adverse witnesses.

### C. Burden of Proof

¶ 46     As one of the prosecutors began her closing argument, she reminded the jury that assault in the first degree was the most serious charge Sanders faced. She then stated,

> Now this is just like an equation. X plus Y
> equals Z. This is the formula you get to follow.
> Or if you're a baker like me, you have
> ingredients to make a cake. You got all the

ingredients; you put them in the right order, you get a cake at the end.

Later, the prosecutor said, "All the evidence you heard are pieces for the puzzle. This is the final puzzle."

¶ 47 Sanders contends that these statements improperly trivialized the People's burden of proof. We disagree.

¶ 48 Comparing the People's burden of proof to simple activities is generally improper, or at least problematic, especially if the prosecutor quantifies how much doubt is "reasonable doubt" or trivializes the People's burden. *See People v. Camarigg*, 2017 COA 115M, ¶¶ 44-47 (noting that the use of a puzzle analogy can be problematic, especially if the speaker quantifies the concept of reasonable doubt); *see also Tibbels v. People*, 2022 CO 1, ¶ 49 (concluding that a judge's use of a crack-in-the-foundation illustration to explain reasonable doubt improperly lowered the People's burden of proof).

¶ 49 But in this case, no such comparison was made. When the prosecutor raised these analogies, she was telling the jury that it had to consider each element of each charge in determining whether Sanders was guilty. Puzzle analogies, and analogies like it,

25

are not improper when used in this context, especially where there was no attempt to quantify the amount of proof necessary to solve the puzzle. The prosecutor's comments did not trivialize the People's burden.

### D. Personal Opinions

¶ 50 During closing argument, defense counsel stated that she wanted the jury to hold Sanders "accountable" for the assault. She asserted, however, that he should not be convicted of first degree assault because he acted in a sudden heat of passion.

¶ 51 In rebuttal, one of the prosecutors stated, "I want you to ask yourselves is Mr. Sanders interested in being held accountable or being held accountable by what he thinks I can prove?" He then repeated the phrase, "I can prove . . . ." numerous times. The prosecutor also compared the credibility of an adverse witness with Sanders's credibility, implying that the witness was more credible.

¶ 52 Sanders asserts that these arguments constituted improper personal opinions because the prosecutor encouraged the jury to rely on what he had personally proven, and he expressed an opinion on the truth or falsity of testimony.

26

¶ 53    A prosecutor may not express a personal belief in the truth or falsity of testimony, but he may draw reasonable inferences about the credibility of witnesses based on the evidence.  *Wilson v. People*, 743 P.2d 415, 419 (Colo. 1987).  Here, when the prosecutor asserted that he could prove certain propositions or facts, and when he discussed credibility, he tied his statements to specific pieces of evidence.  We therefore view these comments as reasonable inferences regarding the credibility of witnesses based on the evidence.  *People v. Rogers*, 220 P.3d 931, 938 (Colo. App. 1997) (noting that a prosecutor's commentary about what the People could prove, when tied to specific evidence, was not improper), *overruled on other grounds by Garcia v. People*, 2022 CO 6.  Further, although ill-advised, a prosecutor's use of the first person singular does not automatically transform his expression of confidence into a personal opinion.  *People v. Fears*, 962 P.2d 272, 285 (Colo. App. 1997) (concluding that although the prosecutor referred to himself in the first person singular, this fact did not turn otherwise proper arguments into improper vouching for the credibility of witnesses).

## E. Misstatements of Law

¶ 54 Finally, Sanders asserts that one of the prosecutors improperly told the jury during rebuttal argument, "I don't want you to consider what Khalil Sanders considered[.] I want you to consider the evidence put before you. I want you to give it the weight you think it's due." Sanders contends that the import of this statement was that his testimony was not evidence the jury should consider. A statement to that effect is inaccurate, and Sanders correctly points out that a prosecutor should not misstate the law. *People v. McMinn*, 2013 COA 94, ¶ 62. When read in context, however, this statement was merely a clumsy attempt to refocus the jury's attention on favorable evidence in response to defense counsel's closing argument. *Perea*, 126 P.3d at 248 (noting that a prosecutor may attempt to draw the jury's attention to back to relevant evidence).

¶ 55 We perceive no error, much less plain error, by the trial court.

## VI. Conclusion

¶ 56 Perceiving no reversible error, we affirm the judgment.

JUDGE GROVE concurs.

JUDGE TOW specially concurs.

28

JUDGE TOW, specially concurring.

¶ 57 I agree that the trial court committed no error by reseating Juror W and by declining to give the defense-tendered jury instruction regarding the witness's absence. I also agree that the prosecutors did not engage in prosecutorial misconduct. Thus, I concur in Parts III, IV, and V of the majority opinion.

¶ 58 I also agree that there was no appearance of partiality, and thus the trial court did not err by denying the motion for disqualification.

¶ 59 I write separately because much of the majority's analysis in Part II.C is merely an advisory opinion. Given that we conclude that there was no appearance of partiality, we need not address whether reversal would be required had there been one.

¶ 60 That question is not an easy one to answer. Our supreme court recently has held that "in the absence of evidence demonstrating actual judicial bias or prejudice, a trial judge's potential violation of [the Code of Judicial Conduct] does not mandate reversal." *Richardson v. People*, 2020 CO 46, ¶ 39. Further elucidating the point, the supreme court said, "[i]n contrast to judicial canons seeking to prevent the appearance of impropriety,

29

laws requiring disqualification of a biased or prejudiced judge are designed to ensure that litigants receive a fair, impartial trial." *Id.* (quoting *People in Interest of A.G.*, 262 P.3d 646, 652 (Colo. 2011)). The import of this observation, at least arguably, is that reversal is not appropriate for a mere appearance of impropriety because the defendant's trial was not presided over by a judge with actual bias or prejudice.

¶ 61     On the other hand, the supreme court did not say, at least explicitly, that reversal in such a case would *never* be warranted.

¶ 62     In short, the post-*Richardson* landscape has not been charted. But in light of our determination that there was no appearance of impropriety at all, our journey does not take us into that territory. We, therefore, should not endeavor to unnecessarily map it.